**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
-----------------------------------------------------------
Robert Steinbuch                                            : Index No.: 4-06 CV0000 620WRW
       Plaintiff,                                         :
                                      :
   -v-                                                       :
                                        :
Jessica Cutler & Hyperion Books & Disney    :
Publishing Worldwide & Home Box Office & :
Time Warner                                                   :
            Defendants.                                :
-----------------------------------------------------------

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**I. Personal Jurisdiction**

In a diversity action, a federal district court in Arkansas may exercise personal jurisdiction over a non-resident party "to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution." Ark. Code Ann. § 16-4-101(B). The due process clause requires that a defendant has had "minimum contacts" with the forum state, "such that [the defendant] should reasonably anticipate being haled into court there" *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287 (1980) and such that maintenance of the suit in the forum is consistent with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). The United States Supreme Court recognizes two types of personal jurisdiction: specific jurisdiction and general jurisdiction, *Helicopters Nacionales De Columbia, S.A. v. Hall* 466 U.S. 408, 416 (1984). "Specific jurisdiction can only be found if the controversy is 'related to' or 'arises out of' the defendant's contacts with the forum state. General jurisdiction exists where the contacts between the defendant and the forum state are 'continuous and systematic' even if there is no

1

Dockets.Justia.com

relationship between the contacts and the cause of action." *Johnson v. Woodcock*, 437 F.3d 702, 2006 WL 250245 at *2 (8th Cir. 2006) (quoting *Helicopters Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1868).

To determine whether Plaintiff can assert personal jurisdiction in Arkansas over Defendants Cutler, Hyperion Books, Disney Publishing Worldwide, Home Box Office, and Time Warner, the United States Court of Appeals for the Eighth Circuit instructs courts within the district to weigh the following five factors: "(1) the nature and quality of [each defendants'] contacts with [Arkansas]; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of [Arkansas] in providing a forum for its residents; and (5) [the] convenience of the parties." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073-1074 (8th Cir. 2004). Significant weight should be given to the first three factors. *Id.*

### A. Specific Jurisdiction

#### 1. Nature and Quality of Contacts

When a defendant interacts with the forum state intentionally, the contact is of the "nature and quality" sufficient for specific personal jurisdiction. "A prima facie case for specific personal jurisdiction exists when the defendant has "purposefully directed its activities at [the forum state] residents, and the claim of th[e] suit either arises out of or relates to those activities." *Lakin v. Prudential*, 348 F.3d 704, 707 (8th Cir. 2003). "When a defendant makes a conscious choice to conduct business with the residents of a forum state, 'it has clear notice that it is subject to suit there.' . . . If [the defendant had not wanted to be amenable to jurisdiction in [the forum state] . . . it could have chosen not to sell its services to [the forum state's] residents. *Zippo Manufacturing Co. v. Zippo*

*Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (*citing World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Defendants purposely availed themselves of Arkansas by intentionally selling their book in this jurisdiction.  Cutler, Hyperion, Disney, and Time Warner specifically contracted to publish and distribute "The Washingtonienne" in <u>all</u> states within the United States.  Defendant's Document 28, Exhibit C at ¶ 2 (Publishing Agreement showing Cutler granted Hyperion exclusive rights to print, publish, and distribute the book throughout the United States—including Arkansas); Defendant's Attachment to Document 40 at 1 (Distribution Agreement showing Hyperion and Disney granted Time Warner rights to distribute their books throughout the United States—including Arkansas); Exhibit 1 (numerous reports showing both Hyperion and Disney published the book – contrary to Disney's claim that it has no involvement in Defendants' Washingtonienne Book).

Defendants' Washingtonienne Book is readily sold and available in Arkansas.  Exhibit 2 (showing Defendants' book for sale in <u>all</u> of Arkansas' major bookstores); Exhibit 3 (showing Defendants' book available in seven of Arkansas' public libraries and advertisements from two of the many Arkansas bookstores that sell "The Washingtonienne" book).  Arkansans are buying this book in Arkansas.  Exhibits 4-9 (showing purchases by Arkansas residents who have purchased "The Washingtonienne" book in Arkansas bookstores and online).  More importantly, however, Defendants have been <u>aware</u> the book was, and is still, selling in Arkansas.  Defendant's Attachment to Document 40, Distribution Agreement at ¶ 2(k)(i) (showing distributing agent will furnish publisher with channels of distribution sales reporting).

Defendants try to claim that their agent distributed their book, and therefore they are not responsible for selling their book. That is not the law in this Circuit.  A manufacturer who "pours its products" into a regional distributor with the expectation that the distributor will penetrate a multi-state trade area has "purposefully reaped the benefits" of the laws of each state in that trade area for due process purposes. *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 615 (8th Cir. 1994).

> [T]he Court of Appeals observed that "[Defendant] certainly benefited from the distribution efforts of [its distributor], and although [Defendant] claims to have had no actual knowledge that [its distributor] distributed fireworks into Nebraska, such ignorance defies reason and could aptly be labeled 'willful.'" The Court of Appeals further explained this was not a case in which the defendant had no reason to know that its product would end up in the forum state, but rather was one in which "the defendant poured its products into regional distributors throughout the country, and now would have this court believe that it had no idea its products were being distributed into neighboring states." . . . [T]he Eighth Circuit held that minimum contacts may be predicated on what the defendants should know, and not on what the defendant actually knows. . . . [Defendant] argued that its lack of an office, agents, employees or property in Iowa precluded a finding of personal jurisdiction, but the Court of Appeals disagreed because "as *Barone* illustrates, the absence of this kind of direct marketing presence does not necessarily mean that [Defendant] has not purposely marketed . . . in Iowa." These cases demonstrate that [Defendant's] lack of advertising, offices, and other connections to Missouri are relevant, but not dispositive. Like the fireworks manufacturer in *Barone*, [Defendant] sold its product to a retailer, fully aware the retailer would sell its product in another state. . . . *Barone* and *Vandelune* make clear that it is enough that [Defendant] purposely utilized a distribution method that it knew or had reason to know would cause its products to be sold in Missouri. . . . [Defendant claims] that merely placing a product into the stream of commerce will not constitute sufficient minimum contacts. This is an overstatement of the law; as *Vandelune* explained, it is important to determine the manner of that placement into the stream of commerce. The cases upon which [Defendant] relies are distinguishable in that the defendant sold its product to a wholesaler in the United States, who then contracted with various distributors. Thus, the defendant had no reason to know where in the United States its products would be distributed.

*Mpressions v. Cato* at *6.  Indeed, in the instant case, Defendants Hyperion and Disney did not sell their product to the distributor, they <u>hired</u> the distributor as their agent,

specified where their book would be distributed, and were informed at all times of the specific channels by which sales were made—making the connection even closer than in the above-cited cases.

Cutler also <u>directly</u> sells her book "The Washingtonienne" to Arkansas from her <u>own personal bookstore</u> and other locations that Cutler specifically endorses. Exhibits 10-11 (showing purchase by Arkansas resident of defendants' book from Jessica's personal online store); Exhibits 12, 9 (showing purchase by Arkansas resident of an autographed copy from a bookstore Cutler promotes in her blog for selling signed copies of defendants' book).

Arkansans are also buying products from Cutler's online sex shop that are directly marketed in connection with her book. Exhibit 13 (showing Cutler's webpage advertisement of her sex shop; showing the "Jessica Cutler Shop" advertised with the headless bust shot that is featured on the front cover of defendants' book); Exhibit 6 (showing purchase by Arkansas resident of lubrication from Jessica's sex shop); Exhibit 14 (showing purchase by Arkansas resident of condoms from Jessica's sex shop, receipt and pictures of the condoms, and confirmation email that the condoms were purchased from Cutler's store); Exhibit 15 (showing comment on Cutler's own webpage from her online store that Arkansas resident bought vibrator from Cutler's store).

<u>Moreover</u>, Cutler individually availed herself of the State of Arkansas when she personally and knowingly went out of her way to ensure that an Arkansas citizen was able to purchase an autographed copy of Defendants' book. Exhibit 16. In furthering the transaction, Cutler's correspondence with this Arkansan consisted of roughly ten separate email exchanges that took place over a time period in excess of one month with Cutler's

5

<u>express knowledge</u> that the person she was contacting was a resident of Arkansas, culminating with Cutler's active facilitation of securing the signed copy for the Arkansas resident. *Id*. Cutler's transaction with this Arkansan is the archetype contact the Supreme Court has held is sufficient to <u>alone</u> establish specific jurisdiction over a nonresident defendant. *Zippo Mfg. Co. v. Zippo DOT Com*, 952 F. Supp. at1127 (citing *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957) ("the Supreme Court has made clear that even a single contact can be sufficient."). The effects of Cutler's actions were clearly felt within Arkansas.

Many courts have addressed whether a Web site can provide sufficient "minimum contacts" to invoke specific personal jurisdiction. *See* "*Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, (3d Cir. 2003) (specific jurisdiction based on internet contacts); *ALS Scan, Inc. v. Digital Serv. Consult., Inc.*, 293 F.3d 707 (4th Cir. 2002) (same); *Bensusan Rest. Corp. v. King*, 126 F.3d 25 (2d Cir. 1997) (same); *Cybersell, Inc., v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir. 1997) (same); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996) (same); *see also Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002) (specific jurisdiction for defamation action)." The analytical framework the great majority of these cases have relied upon in measuring the "nature and quality of the commercial activity that an entity conducts over the Internet" is the "sliding scale" developed in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997):

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that

> does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction.  The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer.  In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.*  (citations omitted).  *See 3M Co. v. Icuiti Corp.*, 2006 U.S. Dist. LEXIS 35706 at *6 (D. Minn. 2006) (defendant's website fell closer to the end of the spectrum "where a defendant clearly does business over the Internet" than to the passive end where information is merely provided because, despite there being only five file transmissions to customers in the forum state, defendant's website "advertised its products to residents across the country, including [the forum state], [] entered into contracts for the purchase of goods with [the forum state's] residents[,] . . . include[d the state] as a shipping destination, and collecte[d] payment over the website.  This activity," the court held, "is sufficient for [the defendant] to reasonably anticipate being haled in [the forum] court." *Rainy Day Books, Inc. v. Rainy Day Books & Café, L.L.C.*, 186 F. Supp. 2d 1158, 1164 (D. Kan. 2002) (specific jurisdiction over defendant operating a website that advertised books and provided a link to a third-party book ordering service when the defendant derived economic benefit from the book sales made through the link).

> [B]y maintaining a commercial website through which it markets and sells its goods, [the defendant] has reached out beyond its home state of Connecticut to avail itself of the benefits of the [State] forum.  Although the actual number of sales to [State] citizens may be small, the critical inquiry in determining whether there was a purposeful availment of the forum state is the quality, not merely the quantity, of the contracts.  By advertising and offering its products for sale via the Internet, [the defendant] has placed its products into the stream of commerce intending that they would be purchased by customers with access to the Web, including [State] citizens.  By engaging in Internet commerce with [State] citizens, [the defendant] has established the minimum contacts that are a prerequisite to the exercise of jurisdiction over it.

*Stomp, Inc. v. NeatO,* LLC, 61 F. Supp. 2d 1074, 1078 n.7 (C.D. Cal. 1999).

Defendants Hyperion and Cutler were on reasonable notice before releasing their book that Plaintiff Robert Steinbuch would bring suit against them in Arkansas. Not only was Steinbuch employed by the State of Arkansas at <u>all times</u> since Defendants first released their book, Exhibit 17 (employment contract of Plaintiff to start work at the University of Arkansas School of Law on June 1, 2005), and therefore has felt his harm arising from the book within this State, but Cutler knew well before releasing her book that Steinbuch could be moving to the area and that he would file a lawsuit if she wrote a book that violated his right to privacy. Exhibit 2 (affidavit of Plaintiff that he informed Cutler of his desire to move to the area and his intention to enforce his rights should she publish a book that violated his right to privacy). Indeed, Plaintiff contracted for employment with the UALR School of Law six months prior to the release of "The Washingtonienne" book, which was known in the Capitol Hill community well before the release of the book. Exhibits 2,17.

Likewise, Hyperion knew before the book was released that Steinbuch would sue them for publishing their book. Indeed, just days after Steinbuch filed his D.C. lawsuit regarding Cutler's blog, Hyperion immediately began preparing their defense for a lawsuit regarding the book, albeit carelessly, by removing incriminating advertisements for the book from their website. Originally, Hyperion advertised the book by explicitly exhorting that the book's contents are factual.

> A sharp, steamy, utterly unrepentant <u>roman à clef[1] exposing the scandalous truth of what goes on in the corridors of power on Capitol Hill, based on the author's actual weblog of the same name.</u> Washington, D.C., staffer Jessica Cutler created

---

[1]    "A roman à clef (French for "novel with a key") is a novel describing real-life events behind a façade of fiction. . . . Notable romans à clef . . . *The Washingtonienne* (2005) based on the author Jessica Cutler's sexual affairs . . . with various men in Washington, D.C." WIKIPEDIA at http://en.wikipedia.org/wiki/Roman_%C3%A0_clef.

> a sensation last year when, in an on-line weblog meant just for friends, she began chronicling her late-night affairs with Washington power brokers. But word about her dishy and humorous account of her relationships with six different men on Capitol Hill inevitably spread around town and became such a hot topic that it got her fired from her entry-level job in the office of Senator Mike DeWine (an Ohio Republican). <u>Now, in *The Washingtonienne*, Cutler's real-life experiences in the capital become fodder for a sexy, semi-autobiographical novel that is sure to initiate a new Washington parlor game of *Who's Who*</u>.

Exhibit 18 (emphasis added). The advertisement continues by specifically referring to Plaintiff's position as a "staff counsel" and unique and identifying details of the relationship between Plaintiff and Cutler. *Id.* Indeed, the advertisement itself also readily admitted that the book was only "loosely fictionalized" from the truth. *Id.*

Days after Steinbuch filed his D.C. lawsuit regarding the blog, Hyperion rushed to re-word their advertisement for the book – specifically removing all previous references to Plaintiff and Hyperion's proud admissions of the non-fiction status of the book. Hyperion's actions were done with such haste to cover its tracks that the ensuing first paragraph is unintelligible.

> The blog that scandalized Washington, D.C., <u>is not a</u> sharp steamy, utterly unrepentant novel set against the backdrop of the nations' capital . . . [sic]

Exhibit 19 (emphasis added) (ellipses that replace text of previous advertisement are in this advertisement and simply trail off with no termination of the sentence or paragraph). What?!?! As is obvious, this new version ham-handedly excludes the direct parallels to fact previously drawn in the original Hyperion advertisement.

Finally, Hyperion put up on its website its current lawsuit-ready, wholly-censored, bare-bones advertisement in place of the previous two. Exhibit 20. The stark contrast to the original website is remarkable. This clearly demonstrates that Hyperion was on notice that it would be subject to suit if it published its then-forthcoming book.

9

Hyperion's obvious efforts to run away from its initial claims of truth and direct references to Plaintiff should be judicially noticed by this Court.

### 2.  Quantity of Contacts

When the conflict itself has some connection with the defendant's contacts in the forum state, the quantity of those contacts becomes a lesser concern, s*ee Capital Equip. v. CNH. Am., L.L.C.,* 394 F. Supp. 2d 1054, 1055, and courts instead shift more weight to the "nature and quality" of the defendant's contacts. *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945).  The greater the "nature and quality" of the defendant's contacts with the forum state, the less important the quantity of the contacts becomes.  In fact, courts have made clear that even a single contact can be sufficient. *See, e.g., 3M Co. v. Icuiti Corp.*, 2006 U.S. Dist. LEXIS 35706 at *6 (D. Minn. 2006) (specific jurisdiction where defendant's only contacts with the forum state were seven sales to the state's customers, five of which occurred over the defendant's website and the other two through a catalogue).

### B.  General Jurisdiction

General jurisdiction "refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose." *Lakin,* 348 F.3d at 707 (citations omitted).  Its determination is "based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts."  *Bailey v. EFO Holdings, L.P.*, 2006 U.S. Dist. LEXIS 25639 at *10-11 (W.D. Ark. 2006) *citing Helicopters*, 466 U.S. at 414-16.  "Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contact test [than is

necessary for specific jurisdiction], requiring the plaintiff to demonstrate the defendant's "continuous and systematic general business contacts." *Bailey v. EFO Holdings, L.P.*, 2006 U.S. Dist. LEXIS 25639 at \*10-11 (W.D. Ark. 2006) *citing Helicopters*, 466 U.S. at 414-16. *See Lakin*, 348 F.3d at 707 (citation omitted).

### 1.  Nature and Quality of Contacts

While defendants' placement of products into the stream of commerce, without more, is not the type of "continuous and systematic" business contacts sufficient to establish general personal jurisdiction, "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example . . . advertising in the forum state, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum state." *Asahi Metal Industry Co. v. Superior Court of California* 480 U.S. 102, 112 (1987).  Purchase contracts with the forum state residents, contracts that apply the law of the forum state, purchase, and advertisements in the local newspaper may form the 'part of something more' needed to establish personal jurisdiction.  *See Barrett v. Catacombs Press,* 44 F. Supp. 2d 717, 726 (E.D. Pa. 1999).

Defendants avail themselves of the State of Arkansas by intentionally and broadly selling their services within the State.  HBO directly solicits Arkansas viewers on its website and provides the direct means for Arkansas residents to obtain HBO products and services.  Exhibit 21.  HBO provides Arkansas viewers approximately twenty-five HBO and HBO-related channels that are available in Arkansas.  Exhibit 22.  Indeed, HBO regularly interacts with its website viewers by soliciting them with a website membership

that enables HBO subscribers to customize their channel schedule according to their viewing habits and location.  *See* www.HBO.com.[2]

### 2.    Quantity of Contacts

HBO regularly does business in the State of Arkansas.  Home Box Office sells their service on fourteen separate channels, in addition to thirteen channels offering HBO's Cinemax channel as well as HBO on Demand.  *See, e.g.,* Exhibit 22 (Little Rock Arkansas Channel Guide).  HBO's website directs Arkansas citizens specifically on how to obtain HBO's services and states that they provide a variety of services to the people of Little Rock, Arkansas and channels to instruct residents of Arkansas on how to get HBO service in their homes.  Exhibit 21.

In fact, HBO has been licensed to do business in Arkansas and has paid franchise filing fees in Arkansas.  Exhibit 23.

HBO also hosts sporting events in Little Rock. Exhibit 24 (HBO advertisement of its hosting of five of Jermain Taylor's Arkansas fights.  Also describing Taylor's HBO hosted Arkansas fights:  "Taylor gave boxing fans a new star, as he truly arrived on the world scene when he returned to his hometown [of Little Rock] on March 27, 2004 to face Alex Bunema (23-5, 18 KOs) on HBO's Boxing After Dark series").  HBO produces documentaries in Arkansas.  Exhibit 25 (HBO website states its "filmmakers return to Little Rock to update [its previous Little Rock documentary.");  Exhibit 26 (Time Warner's website states:  "HBO documentary 'Paradise Lost: The Child Murders at Robin Hood Hills,' [] the controversial case of three Arkansas teenagers convicted in 1994 of murdering three eight-year-old boys"); Exhibit 27 (HBO cements a deal with

---

[2]        Moreover, this information was garnered absent any jurisdictional discovery.  *See Lakin v. Prudential*, 348 F.3d at 713.

Little Rock-native filmmakers for a film on Central High to air in the fall of 2007, the 50th anniversary of the school crisis); Exhibit 28 (HBO website describes its documentary exposing dog abuse at Martin Creek Kennel in Arkansas).  HBO conducts interviews with Arkansas residents in Arkansas.  Exhibit 29 (HBO interviews the Jermain Taylor family).

Similarly, Time Warner readily does business in Arkansas.  *See* Exhibit 30 (<u>Time Warner Inc. offers 2,000 jobs to Arkansans in West Memphis, Arkansas</u>, including: "Newspaper, Media or Journalism Jobs – Art, Graphics or Drafting – Management and Executive – Internships – Summer – Human Resources – Entry-Level Marketing – Retail – Public Relations – Construction – Information Technology"); Exhibit 31 ("Time Warner has applied to the Arkansas Public Service Commission to start offering phone service"); *see Foster v. Time Warner Entertainment*, 250 F.3d 1189, 1192 ("Foster was employed by Time Warner as a supervisor of customer service representatives in Fayetteville, Arkansas").  Time Warner offers high speed internet subscription to Arkansans:

> Time Warner provides the modem, the installation, the news and entertainment, tools for using the Internet and your computer, plus world-class customer support. . . . Arkansas Time Warner Subscription Extras [include]: Arkansas Time Warner multiple unique email accounts . . . Arkansas Time Warner road Runner Messenger . . . Arkansas Time Warner personal Home Page Space . . . Arkansas Time Warner cable modem. . . . Thousands of Jonesboro, Little Rock residents have already chosen Time Warner Arkansas cable Internet; how about you?  The service is available in areas with the following area codes: 501, 870.

Exhibit 32.

Likewise, Disney Publishing Worldwide and Hyperion regularly do business in the State of Arkansas.  Contrary to Disney's explicit assertions to this court (Doc. 39, pg. 11) <u>Disney Publishing Worldwide is currently licensed to conduct business within the</u>

<u>State of Arkansas</u>, Exhibit 33.  Indeed, Disney Publishing retains registered agents of service within the State of Arkansas and pays taxes and fees within the State of Arkansas. *Id*. (showing registered agent of service for Disney Publishing Worldwide located at 101 S. Spring Street, Suite 220, <u>Little Rock, AR</u> 72201).

Moreover, in addition to "The Washingtonienne" book being currently sold in all of Arkansas' major bookstores, any Arkansas resident could easily see that Hyperion and Disney Publishing's innumerable other books flood virtually every bookstore within the state.  *See* Exhibits 2, 34.  Defendants are aware of their presence within the State of Arkansas.  Defendant's Attachment to Document 40, Distribution Agreement at ¶ 2(k)(i) (showing distributing agent will furnish publisher with channels of distribution sales reporting).  They derive economic benefit from their activity within the State, and their contacts with this State are excessively substantial, continuous, and systematic <u>for the State of Arkansas</u>.

"The percentage of a company's sales in a given state are generally irrelevant.  Instead, the focus is on whether a defendant's activity in the forum state is continuous and systematic. Many companies conduct millions of dollars in sales worldwide yet only do a small percentage of their sales in any one state. . . .  However, our relevant inquiry is not whether the percentage of a company's contacts is substantial for that company; rather, our inquiry focuses on whether the company's contacts are substantial for the forum." *Lakin*, 348 F.3d at 709 (citations omitted).

Finally, even Defendant Cutler has general contacts with Arkansas.  Arkansans are also buying products from Cutler's online sex shop that are directly marketed in connection with her book.  Exhibit 13 (showing Cutler's webpage advertisement of her

sex shop; showing the "Jessica Cutler Shop" advertised with the headless bust shot that is featured on the front cover of defendants' book); Exhibit 6 (showing purchase by Arkansas resident of lubrication from Jessica's sex shop); Exhibit 14 (showing purchase by Arkansas resident of condoms from Jessica's sex shop, receipt and pictures of the condoms, and confirmation email that the condoms were purchased from Cutler's store); Exhibit 15 (showing comment on Cutler's own webpage from her online store that Arkansas resident bought vibrator from Cutler's store).

### C. Forum Convenience and Interest of the State

As discussed above, these remaining factors are of lesser importance to the Courts. Nonetheless, Defendants' claims that they inure to their benefit is incorrect. Defendants point to the location of Defendants and Plaintiff's Counsel to claim that another (unnamed) forum would be more convenient. Defendants intentionally ignore that four out of the five Defendants are multinational corporations, with at least one of them currently having an agent for service in this State. The remaining Defendant, Cutler, is having her defense financed by Hyperion. Defendants can easily appear in Arkansas. Moreover, in pointing to the location of Plaintiff's Counsel, Defendants fail to note for the Court that all of Defendants' eight listed Counsel of Record are based in Little Rock, Arkansas. Finally, Defendants fail to speak to the fact that Plaintiff is a public servant employed and residing in Little Rock, which dovetails with the interests of this State in protecting the rights of one its citizens. *See Lakin v. Prudential*, 348 F.3d at 713.

**III.    This is Not the DC Case**

Defendants assert that this case – for the intentional invasion of Plaintiff's privacy and other causes of action arising from Defendants' publication of book about him – is the same as the Plaintiff's case in Washington DC arising from events occurring over a year prior.  Defendants argument is flawed for three reasons.  First, Defendant has admitted in the DC case that "[Plaintiff] seeks no relief in the complaint arising out of the book's publication."  Defendant's Reply Brief in the DC Case, Document # 8, at 4. Second, the DC case was filed the month <u>prior</u> to the book's publication.  Finally, Defendant contends that this case would be more convenient for Plaintiff because he has a prior suit filed in DC, when he lived in the DC area.  Plaintiff lives in Arkansas and works for the UALR School of Law.  That Plaintiff had a prior lawsuit in a different state, when he lived elsewhere does not support an argument for convenience.

**IV.    Counsel for Defendant HBO/Time Warner**
**Violated the Very Rule She Attempted to Invoke**

Counsel for HBO and Time Warner have improperly moved for Rule 11 sanctions.  Defendants' Counsel has failed to abide by the very rule that they cite, F.R.C.P. 11, by:  (1) not making the demand in a separate motion and serving it on Counsel for Plaintiff and by requesting Rule 11 sanctions as part of their motions to dismiss; (2) failing to serve its Rule 11 motion on undersigned counsel 21 days prior to filing it; (3) failing to provide Counsel for Plaintiff time to cure <u>alleged</u> violations as set forth in Defendants' improper Rule 11 motion.  Rule 11 was specifically designed to prevent Attorney from throwing in claims in other motions.  Rule 11 allegations are very serious and should not be taken lightly.

**A.     HBO's and Time Warner's Assertions of Facts are
False and Plaintiff Has Stated Valid Causes of Action**

Counsel for HBO and Time Warner baldly asserts that "HBO has optioned the

rights to Ms. Cutler's book, but has not yet exercised its option to move forward with

production."  Motion to dismiss and improper Rule 11 motion of Defendants HBO and

Time Warner at 4 (document 45 on this Court's docket).  Based on this incorrect

assertion, Counsel for HBO and Time Warner wrongly declare that Plaintiff seeks an

advisory opinion and therefore has not stated valid claims.[3]  *Id.*  HBO/Time Warner is

mistaken.  Notwithstanding the bald-faced assertion by counsel for HBO and Time

Warner, their clients promoted and advertised within the industry and to the general

public the ongoing development of the TV show regarding the existing book that invades

Plaintiff's privacy and constitutes other torts.  Accordingly, Plaintiff rightfully seeks

injunctive relief.

**1.     HBO and Time Warner Assertion That They Have Done
Nothing Other than Purchase an Option is an Intentional
Misstatement of Fact**

Prior to this action being filed, a veteran producer/writer and actor in Hollywood

approached the undersigned counsel and inquired whether I was aware that the book

"The Washingtonienne," based and advertised on my client Law Professor Robert

Steinbuch's life story was optioned by Time Warner / HBO, that Sarah Jessica Parker's

production company, Pretty Matches Productions, was developing the project as their

premier project to launch her new company, a writer had been attached, a co-executive

producer had been attached to the project, Jessica Cutler herself was hired as a Creative

Consultant on the project, HBO was listed as the distributor of the upcoming 30 minute

---

[3]      Time Warner asserted that service upon it was improper.  Accordingly, Plaintiff has reserved Time
Warner at its requested location.

comedy, and that it had been announced in the leading industry newspaper, Variety, and

the leading online source of Entertainment industry information, IMDB.com. Yet,

Counsel for Defendants continues to assert that "HBO . . . has not yet exercised its option

to move forward with production."

All of these facts have been established prior to filing this suit, yet counsel for

Defendants continues to suggest otherwise, and, in fact, seeks sanctions improperly based

thereon. There are many examples to demonstrate the facts that counsel for defendants

continues to deny:

First, In the United States District Court for the District of Columbia, Judge Paul

L. Friedman declared that "[Cutler] wrote a novel, which apparently Sarah Jessica

Parker's company is now interested in making into a television show." Transcript page

44, lines 14-15 hearing before United States District Court for the District of Columbia

April 5, 2006 before the Honorable Paul L. Friedman. Yet, Counsel for Defendants

continues to assert that "HBO . . . has not yet exercised its option to move forward with

production."

Second, the Washington Post reported that:

Look out, all you Washingtonians who ever had sex with Jessica Cutler, proposed
having sex with Jessica Cutler, discussed sex with Jessica Cutler, or ever brushed
up against Jessica Cutler -- the infamous Senate aide whose sexual antics
scandalized/enthralled our fair city a couple of years ago. **HBO is plowing ahead
with a sitcom based on "The Washingtonienne,"** the D.C.-set novel inspired by
Cutler's blog of same name in which she discussed her exploits with a boatload of
men around town in such glorious detail. The pay-cable network project is being
developed by Sarah Jessica Parker's Pretty Matches production company. . . . The
comedy -- unless you're one of Cutler's sex partner-muses -- now has a
scriptwriter attached: Vanessa Taylor. . . . And Jason Blum, described as a
"young, hot, up-and-coming guy" by one of our sources, has been attached as a
co-executive producer. He was the executive producer of HBO's flick "Hysterical
Blindness," which starred Uma Thurman and Juliette Lewis as single chicks
seeking guys in '80s New Jersey. You'll get a kick out of this: Cutler, who less

than two years ago was telling anyone who could use a laptop that she "just took a long lunch with X and made a quick $400," has gone all shy and reticent when we e-mailed her to try to talk to her about the HBO project. She declines to comment, a rep told The TV Column.

www.washingtonpost.com/wpdyn/content/article/2006/03/15/AR2006031502391

_p..., July 24, 2006 (emphasis added).   Yet, Counsel for Defendants continues to assert

that "HBO . . . has not yet exercised its option to move forward with production."

Third, the Web's best television resource stated that:

WASHINGTONIENNE (HBO, New!) - Novelist Jessica Cutler's book of the same name is being developed as a half-hour comedy at the pay channel by actress/producer Sarah Jessica Parker and writer/producer Vanessa Taylor ("Jack & Bobby"). "Washingtonienne" detailed Cutler's experiences as a staffer for Sen. Mike DeWine (R-Ohio) who was fired after the popular political blog Wonkette.com posted excerpts of her online sex diary, in which she talked of trysts with up to six different men. Taylor will pen the pilot script and executive produce with Parker via Parker's recently launched Pretty Matches Productions banner. Cutler herself will serve as a consultant.

http://www.thefutoncritic.com/newswire.aspx?id=7110, July 24, 2006 (emphasis

added). Yet, Counsel for Defendants continues to assert that "HBO . . . has not yet

exercised its option to move forward with production."

Fourth, specific details of key elements of the new television show were set forth

in the New York Post.  New York Post Online Edition, PRIMETIME.COM, by Mandy

Stadtmiller, March 23, 2006.  Yet, Counsel for Defendants continues to assert that "HBO

. . . has not yet exercised its option to move forward with production."

Fifth, the industry leading source of entertainment news reported that:

Parker teams to bring sexy tome to cabler.  Sarah Jessica Parker is teaming with scribe Vanessa Taylor ("Jack & Bobby") for a half-hour HBO comedy based on "Washingtonienne," the steamy D.C.-set novel inspired by the real-life sexcapades of author Jessica Cutler.  It's the first project to emerge from Parker's Pretty Matches Prods. since the shingle set up shop at HBO last year.  Parker will exec produce, with Taylor writing the pilot and exec producing.  There are no plans for Parker to act in the project. Cutler will serve as a consultant.  Cutler gained notoriety when D.C.'s Wonkette blog published excerpts from Cutler's

19

online sex diary, in which she talked of trysts with up to six different men.  She was fired from her job working for Sen. Mike DeWine (R-Ohio) as a result. . . . Within a year, Hyperion published "Washingtonienne," Cutler's novelization of her experiences.  Parker's Pretty Matches then optioned the TV rights to the book and brought in Taylor to write and exec produce the pilot script.  Taylor and Parker are just beginning to flesh out how to bring "Washingtonienne" to the small screen, but Taylor predicted the final result will be "a controversial character."  "There have been a lot of morally ambiguous male characters finding acceptance on TV, but we haven't seen that with female characters," Taylor said, calling the character Cutler created for her novel emblematic of her generation in many ways. . . .   In addition to co-creating "Jack & Bobby," UTA-repped Taylor wrote the FX pilot "The Big Lie" last year.  Her other credits include "Alias," "Everwood" and "Gideon's Crossing."

http://www.variety.com/index.asp?layout=print_story&articleid=VR1117939781

&categor..., July 24, 2006.  Yet, Counsel for Defendants continues to assert that "HBO . .

. has not yet exercised its option to move forward with production."

## V.    "The Washingtonienne" Is Not a Work of Fiction

        HBO and Time Warner baldly assert that the book they are transforming into a

TV series is fiction.  However, that "The Washingtonienne" book would be based upon

Cutler's <u>real-life</u> romantic and sexual relationship with Plaintiff was a <u>condition</u> of

Defendants' publishing agreement:

> <u>The Washingtonienne is a roman á clef</u> about a young woman's escapades in the marble hallways and posh hotels of Washington, DC, <u>based on the author's real life social and sexual escapades as recorded in her scandal-inducing blog, Washingtonienne.</u>

Document 28 on this court's docket, Publishing Agreement at 1.  "The test is neither the

intent of the author, nor the recognition by the plaintiff that the article might be about

him.  The test is whether a reasonable person could reasonably believe that the article

referred to the plaintiff. . . .  Viewed as an invasion of privacy case, the identification v.

fictional problem is the same."  *See Smith v. Huntington Publishing Co.*, 410 F. Supp.

1270, 1273-74 (D. Ohio 1975); *Cf. Geisler v. Petrocelli*, 616 F.2d 636, 637-39 (2d Cir.

1980) (valid claim for false depiction "untoward sexual conduct which is graphically

portrayed [in allegedly fictional book]").

> Indeed, it is readily recognized that "The Washingtonienne" book is not fiction:

> "Novel" is in quotation marks for the obvious reason: Apparently just about the only fictitious things in 'The Washingtonienne' are the names. Everything else appears to be a literal account of Cutler's adventures, from her college years at Syracuse to her brief fling on the New York nightclub scene to her arrival in Washington, where she finagled a job on the Hill, merrily hopped from bed to bed and got what passes for a comeuppance in this city, where the only crime is getting caught and the rewards for hanky-panky are lavish: notoriety, airtime and a fat book contract.

Capitol Hill Siren's Tell-All Fiction By Jonathan Yardley, Washington Post, Tuesday,

May 24, 2005; Page C01.  "[W]hile you read [The Washingtonienne book], remember

that the studly Jewish guy who looks like George Clooney is really Robert Steinbuch."

"World O'Crap Book Club: Sleazy Summer Reading," May 20, 2005,

http://blogs.salon.com/ 0002874/2005/05/20.html.  "Marcus (in real life, the newly-

visible Robert Steinbuch)."  "The DCist Book Review:  'The Washingtonienne,' May 24,

2005, http://www.dcist.com /archives/2005/ 05/24/the_dcist_book.php.  "RS, Marcus'

inspiration and the staffer in Dewine's office.  *Id.*  "Jackie's psychiatrist recommends

she goes to AA to cope with a slight (ahem, sarcasm) drinking problem.  Jackie agrees to

do so.  She arrives at the meeting and … gasp … Marcus (a.k.a. Steinbuch) is there."

"Jenny From the Block," May 19, 2005,

http://www.syracuse.com/weblogs/print.ssf?/mtlogs/syr_cnyscene /archives

/print061792.html.

> The book itself was found in the fiction section of the bookstore, but after some quick research, it looks like Jessica did the classic bait-and-switch.  Yup, it's pretty much the scandalous blog that allowed Jessica to cash in on her fifteen minutes, just with a few name changes. . . . Jacqueline Turner (a.k.a. Jessica) . . . eventually sleeps with another guy who is the staff attorney at the senator's

office (Jessica calls him "Marcus," but apparently his name is Robert Steinbuch, a 37 year-old attorney who lives in Bethesda, MD.).

*Id.*

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied.


Dated:  October 10, 2006


                                      _/s/_ Jonathan Rosen
                                        Jonathan Rosen, Esq.
                                        1645 Lamington Rd.
                                        Bedminster, NJ 07921
                                        (908) 759-1116
                                        Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2006, I presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system, which shall send notification of such filing to the following:

Philip S. Anderson     psa@williamsanderson.com, mroach@williamsanderson.com; bwalton@williamsanderson.com

Jess L. Askew , III    jaskew@williamsanderson.com, eperryman@williamsanderson.com; ssmith@williamsanderson.com

Beth M. Deere     bdeere@williamsanderson.com, fdavis@williamsanderson.com

Gary D. Marts , Jr.     gmarts@wlj.com, rmoles@wlj.com

Claire Hancock          chancock@wlj.com

Jonathan S. Rosen     xjonathan@mac.com

Clayborne S. Stone     cstone@williamsanderson.com


       _/s/_ Jonathan Rosen
Jonathan Rosen, Esq.
1645 Lamington Rd.
Bedminster, NJ 07921
(908) 759-1116
Attorney for Plaintiff