```
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
-----------------------------------------------------------
Robert Steinbuch                              :      4-06 CV0000 620 WRW
         Plaintiff,                           :
                                              :
    -v-                                       :
                                              :
Jessica Cutler & Hyperion Books & Disney      :
Publishing Worldwide & Home Box Office &      :
Time Warner                                   :
         Defendants.                          :
-----------------------------------------------------------
```

## PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' REPLIES

**I.    Defendants Have Improperly Filed Replies**

The Federal Rules do not give movants the right to file a reply. Some district courts allow movants to file replies pursuant to local rules. However, this Court does not allow for replies. *See* Local Rule 7.2. Defendants, however, filed replies without leave of the Court. Accordingly, Plaintiff moves to strike the filings. Moreover, as discussed below, Defendant's arguments are without merit.

**II.   Jurisdiction Is Clearly Established in Arkansas**

Hyperion blurs a crucial distinction in their assertion that publishers must be "directly" responsible for the distribution of their product in the forum state before courts will condone haling them into the State's court. Courts surely refuse to exercise personal jurisdiction over defendant publishers when their contacts with the forum state is nonexistent, for example when they *sell* products to third-party, national distributors, never having a reason to know where in the United States the product will be distributed. *See Gilmer v. Walt Disney, Co.*, 939 F.Supp. 665, 674 (W.D.Ark. 1996); *Christian v. Barricade Books, Inc*, 2003 U.S. Dist. LEXIS 8555, 31 Media L. Rep. 2303 (Dist. Ct.

N.H. 2003).  It is true that the "placement of a product into the stream of commerce, <u>without more</u>, is not an act of the defendant purposefully directed toward the forum State. [However, a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example . . . <u>marketing the product through a distributor</u> who has agreed to serve as the sales agent in the forum State." *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 112 (U.S. 1987) (emphasis added); *see Gray v. St. Martin's Press, Inc.*, 929 F. Supp. 40, 48 (D.N.H. 1996).  In *Gray*, the Court held:

> In short, this case does not present a simple stream of commerce scenario. The record shows that Trento engaged in "additional conduct," indicating an intent or purpose to serve the New Hampshire market. While this evidence of purposeful availment is not particularly strong, it is sufficiently strong to satisfy the basic due process concerns of foreseeability and voluntariness. By executing a contract with a national publisher for the national and international distribution of a book with nationwide appeal, Trento should reasonably have anticipated being haled into court in New Hampshire, a forum regularly served by St. Martin's and one in which the book was actually sold. The terms of the Contract, including the financial incentives it creates, also show that St. Martin's in-state distribution of The Power House was not the distinct unilateral act of a third party, but an act intended by Trento. Therefore, Gray has made a prima facie showing that Trento purposefully availed herself of the New Hampshire marketplace.

*Id*. at 48.[1]

Hyperion did not simply sell this book, *The Washingtonienne*, to a third party distributor, after which the book "found its way" into all of Arkansas and throughout the nation.  Rather, Hyperion <u>hired</u> the distributor Time Warner, granting Time Warner "the exclusive right, as <u>agent on behalf of Publisher</u>, to distribute all lines" of the book within "[t]he United States, its territories and possessions, including military accounts, wherever situated."  Defendant's Attachment to Document 40, Distribution Agreement at ¶ 1.  *See*

---

[1] The evidence must be viewed in a light most favorable to Plaintiff. *Id*. at 47.

*Gray v. St. Martin's Press, Inc.*, 929 F. Supp. 40, 48 (D.N.H. 1996) (in facts remarkably similar to the instant case, Court found jurisdiction over defendant whose only contact with the forum State was through an exclusive agreement with a nationwide distributor). Thus, Hyperion camouflages poorly among the defendants to which it refers in attempt to illustrate a lack of personal jurisdiction because defendants in those cases <u>sold</u> products to third parties and therefore never had a reason to know where in the United States its product would be distributed. *Guinness Import Co. v. Mark VII Distribs., Inc.*, 153 F.3d 607, 614 (8th Cir. 1998) (defendant Jamaican beer manufacturer <u>sold</u> beer to importers who subsequently contracted with distributors to sell the beer throughout the United States); *Dever v. Hentzen Coatings, Inc.,* 380 F.3d 1070, 1074-75 (8th Cir. 2004) (defendant "<u>sells</u> its products from Memphis, Tennessee to various retailers and specialty industries who in turn sell them to consumers"). Unlike defendants in those cases, Hyperion did not simply sell a product to a third party distributor, completely transferring ownership interest in the product. Instead, Hyperion hired the distributor as its agent. Defendant's Attachment to Document 40, Distribution Agreement at ¶ 5(a). National distribution of *The Washingtonienne,* including distribution within the State of Arkansas, was the "*raison d'etre*" of the Distribution Agreement between Hyperion and Time Warner. *See Gray v. St. Martin's Press, Inc.*, 929 F. Supp. at 48. Therefore, by hiring Time Warner solely for this purpose, Hyperion intentionally directed *The Washingtonienne* to Arkansas through Time Warner. *Id.*

Hyperion cites two cases in which courts denied personal jurisdiction over a defendant, despite the defendant selling products in the forum state through a distributor. In both of these cases, however, defendants played only a passive role in selling the

product.  *See Gilmer v. Walt Disney, Co.*, 939 F.Supp. 665, 674 (W.D.Ark. 1996) ("Plaintiff advances no facts to suggest that [the film producer] played any part in the distribution or promotion of the film or in the decision making process regarding the manner or places of distribution); *Christian v. Barricade Books, Inc*, 2003 U.S. Dist. LEXIS 8555, 31 Media L. Rep. 2303 (Dist. Ct. N.H. 2003) (no facts to suggest that the distributor was an agent of the publisher or that the two joined marketing efforts).

Hyperion substantially collaborated with Time Warner in selling *The Washingtonienne*.  Hyperion—not Time Warner—was "solely responsible for all advertising, promotion and publicity" of the *The Washingtonienne*.  Defendant's Attachment to Document 40, Distribution Agreement at ¶ 4(b).  Hyperion consulted Time Warner "with respect to establishing marketing plans, sales forecasting, determining appropriate print runs, and planning advertising and promotional campaigns" for *The Washingtonienne*, after which, Hyperion—not Time Warner—made the final decisions.  Defendant's Attachment to Document 40, Distribution Agreement at ¶ 2(d).  Hyperion set the *The Washingtonienne*'s cover price and determined the number of copies to be printed.  *Id.* at ¶ 4.  Hyperion retained a direct and substantial financial interest in *The Washingtonienne*'s nationwide distribution.  *Id.* at ¶ 9. Moreover, booksellers checking *The Washingtonienne*'s availability by accessing Pubeasy services, an online bookselling interface to which Distributor Time Warner subscribes, "link seamlessly" to Hyperion's own marketing website.  *Id.* at ¶ 2(k)(iii) and http://www.pubeasy.com/demo2/frame.html at slide 17.   Most importantly, however, Hyperion knew at all times which suppliers ordered *The Washingtonienne*, where they were located, and how many copies each of them ordered.  *Id.* at ¶ 2(k)(i) (showing Hyperion furnished with channel of distribution

sales reporting); *Id.* at ¶ 2(h)(i) (showing Hyperion supplied regularly with reports "as to cumulative and monthly sales and returns"); *Id.* at ¶ 2(k)(iii) (showing Hyperion provided with "access to the 'Rep' module of the Pubeasy service," an online bookselling interface that "offers Affiliates with detailed metrics on who is ordering from them and how much they are ordering." *See* http://www.pubeasy.com/publishers/ central.html); see *Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 429 (Fed. Cir. 1996) (personal jurisdiction established over defendant manufacturer who received, *inter alia*, sales reports from distributor on a regular basis).

Hyperion's marketing efforts and distribution contacts were calculated attempts to create a nationwide market for its book. Defeating jurisdiction pursuant to Hyperion's claims merely because the distribution portion of the process was outsourced to a distributing agent that worked for Hyperion would enable Hyperion to:

> insulate itself against suit in every state of the union except the state of publication. . . . By a proper degree of care, the publisher could eliminate nearly all physical contacts, other than circulation and correspondence, with all but one state. No doubt such a course would be motivated primarily by a desire to avoid legal actions brought in the other states where the publications were circulated. Clearly it would not comport with notions of fair play and substantial justice to allow a business enterprise, whose overriding business purpose is maximum exploitation of the national market, to be free from suit as a matter of law in all states but that of publication simply because physical contacts with the other states had been reduced to a minimum. The legal principle urged upon us by [defendant] would allow a publisher, fully aware of the strong possibility of resulting legal action, to print libelous matters directed at persons in distant localities, yet remain free from suit in such localities in spite of the pecuniary benefits gained in that very jurisdiction where it asserts it cannot be held legally accountable. A rule of law allowing such a condition would clearly not conform to the purposes behind the "minimum contacts" due process requirement.

Cf., *Curtis Publishing Co. v. Golino*, 383 F.2d 586, 591 (5th Cir. 1967).

### III. Defendants Misstate the Objective Facts

Cutler's alleged ignorance of the Arkansan's location for whom she facilitated a request for a signed copy of *The Washingtonienne* is patently false. The Arkansas resident emailing Cutler wrote, "Hi Jessica, Any luck with the bookstores. I hate to be a pest, but none of the bookstores <u>in Arkansas</u> have an autographed copy," to which Cutler <u>replied</u>. Plaintiff's Opposition to Motion to Dismiss Exhibit 16. Is this the text that Defendant asserts there was nothing to suggest to Defendant that this Arkansas resident is in fact a resident of Arkansas? Defendant may not mischaracterize the objective facts in this fashion.

Oddly, Cutler wishes for this court to believe that from both of her own online stores, the "Jessica Cutler Shop" and "Jessica Cutler's Bookstore," Cutler sells *nothing*. She does; residents of Arkansas purchase products from both the "Jessica Cutler Shop," Plaintiff's Opposition to Motion to Dismiss at Exhibit 6 (showing Declaration of Arkansas resident who purchased lubrication from "the 'Shop' section of Jessica Cutler's website, http://www.jessicacutleronline.com."), Exhibit 14 (showing Declaration of Arkansas resident who purchased condoms from the link Cutler provides to her sex shop), and Exhibit 15 (showing Arkansas resident's comment regarding purchase from Cutler's sex shop) and from "Jessica Cutler's Bookstore." *Id.* at Exhibit 8 (showing Declaration of Arkansas resident who purchased *The Washingtonienne* from "Jessica Cutler's Bookstore"). She asserts instead that only third parties, intimategifts.com and amazon.com, sell products from her stores. It is true as Cutler contends that visitors of jessicacutleronline.com and Cutler's *MySpace* website must follow her link to an additional website in order to arrive at the sex shop, however this additional, "third-party" website is entitled, "Welcome to the Jessica Cutler Shop at intimategifts.com." *Id.*

at Exhibit 13.  This title alone shows that the Jessica Cutler Shop is not *separate* from intimategifts.com as Cutler deceptively attempts to lead this court to believe, but rather it explicitly states that the Jessica Cutler Shop is *part of* intimategifts.com.  Indeed, "Sender McGowan" at intimategifts.com confirmed to one Arkansas resident that the condoms the resident purchased using the link Cutler provides in her *MySpace* blog "were definitely purchased from Jessica Cutler's store."  *Id.* at Exhibit 14 (emphasis added).  Cutler sells *The Washingtonienne* book from "Jessica Cutler's Bookstore" in precisely the same way she sells her sex products.  Specifically, she advertised from the August 30, 2006 entry of her blog at jessicacutleronline.com, "I have an online bookstore" from which a visitor of her blog choosing to go to her bookstore must follow a link to an additional webpage, this one entitled "Jessica Cutler's Bookstore," again, hardly a third party's website.  And, contrary to Cutler's bald-faced assertion that neither of her websites are interactive, both the "Jessica Cutler Shop" and "Jessica Cutler's Bookstore" are interactive -- soliciting customers to buy products and selling products to those customers.

Cutler's statement to this Court that all of the transactions occurring between Arkansas residents and defendants are irrelevant because they took place after the filing of this lawsuit is both false and irrelevant.  Defendants began mounting contacts with the State of Arkansas long before Plaintiff filed this lawsuit.  For example, an Arkansan purchased a copy of *The Washingtonienne* in August, 2005, just two months after the book's first publishing and nearly one full year before the filing of this lawsuit.  Plaintiff's Opposition to Motion to Dismiss, Exhibit 7.  Nevertheless, even Defendants' contacts with the State occurring *after* the filing of this lawsuit are relevant for determining personal jurisdiction over Defendants insofar as those contacts arise out of

the cause of action, that is, insofar as the contacts continue to infringe on Plaintiff right to privacy and emotional distress. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1562-63 (Fed. Cir. 1994). Defendants' continued sale of *The Washingtonienne* within the State of Arkansas does this precisely. Transactions with Arkansans who may have bought this book after the filing of this lawsuit must therefore supplement this Court's determination of personal jurisdiction over Defendants. In cases involving continuing harm, minimum contacts with the forum that occur after the events giving rise to the litigation are relevant for determining specific personal jurisdiction because "it would be arbitrary to identify a single moment after which the defendant's contacts with the forum necessarily become irrelevant." *Id.*; *see also*, *Endless Pools, Inc. v. Wave Tec Pools, Inc.*, 362 F. Supp. 2d 578, 584 (E. D. Pa. 2005).

Cutler masks the details of her "simple google search" that she conducted hoping to identify the individuals who signed Declarations in support of Plaintiff's Motion in Opposition because she knows that the results she presents to this Court, that all of the individuals are professors, students, or "other members of the community involved with the UALR law school," are in fact patently <u>false</u>. Moreover, Defendant's last category seems designed to capture everyone in Little Rock. But, to Defendant's chagrin (perhaps), this catch-all category is still insufficient for their assertion. For example, one affiant lives nearly three hours from the UALR law school in Hamburg, Arkansas, is not a student or a professor there, and neither knows nor has ever met Plaintiff. *See* Plaintiff's Opposition to Motion to Dismiss Exhibit 14. Similarly, another affiant is simply not affiliated with the UALR law school. *See Id.* at Exhibits 8, 16. Indeed, as stated already, an Arkansas resident purchased *The Washingtonienne* nearly one year

prior to the filing of this lawsuit after "hear[ing] discussion concerning the book from people in Little Rock about a new member of the community." *Id.* at Exhibit 7 (emphasis added). That other individuals who signed Declarations in support of Plaintiff's Motion to Dismiss are in some way affiliated with the UALR law school, while not relevant, is particularly ironic given that Defendants have foreclosed the very discovery that would have provided additional jurisdictional evidence. To preclude Plaintiff from seeking discovery and now complain that some of the sources of Defendants' contacts are known personally to Plaintiff is disingenuous. *See Lakin v. Prudential*, 348 F.3d 704, 713 (8th Cir. 2004) (case remanded by Eighth Circuit for jurisdictional discovery when initially denied by district court).

## CONCLUSION

This Court should grant Plaintiff's motion to strike and deny Defendants' motions to dismiss.

Dated: November 12, 2006

           /s/ Jonathan Rosen
Jonathan Rosen, Esq.
1645 Lamington Rd.
Bedminster, NJ 07921
(908) 759-1116
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

CERTIFICATE OF SERVICE

9

I hereby certify that on November 12, 2006, I presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system, which shall send notification of such filing to the following:

Philip S. Anderson    psa@williamsanderson.com, mroach@williamsanderson.com; bwalton@williamsanderson.com

Jess L. Askew , III    jaskew@williamsanderson.com, eperryman@williamsanderson.com; ssmith@williamsanderson.com

Beth M. Deere    bdeere@williamsanderson.com, fdavis@williamsanderson.com

Gary D. Marts , Jr.    gmarts@wlj.com, rmoles@wlj.com

Claire Hancock    chancock@wlj.com

Jonathan S. Rosen    xjonathan@mac.com

Clayborne S. Stone    cstone@williamsanderson.com

                                                                       _/s/_ Jonathan Rosen
Jonathan Rosen, Esq.
1645 Lamington Rd.
Bedminster, NJ 07921
(908) 759-1116
Attorney for Plaintiff